# UNITED STATES
# DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

## CIVIL ACTION NO. 09-40118-GAO

### WILLIAM E. SPERBECK and
### ARCLOGIX, INC.,
**Appellants,**

**vs.**

### JOSEPH BRAUNSTEIN,
### CHAPTER 7 TRUSTEE OF
### LOGISTICS INFORMATION SYSTEMS, INC.
**Appellee**

On Appeal from a Final Order in a Contested Matter, and from a
Judgment in an Adversary Proceeding (04-1188-JBR), of the
United States Bankruptcy Court for the District of Massachusetts

**IN RE LOGISTICS INFORMATION SYSTEMS, INC.**

**Chapter 7**
**Case No. 03-10886-JBR**

# BRIEF OF THE APPELLEE

Mark W. Corner (BBO No. 550156)
mcorner@riemerlaw.com
*Counsel for the Appellee*
RIEMER & BRAUNSTEIN LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000

DATED:  October 9, 2009

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ........................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .................................. 1

STATEMENT OF THE APPLICABLE STANDARD OF APPELLATE REVIEW ..................... 1

STATEMENT OF THE CASE ..................................................................................... 2

      1.     Procedural History ........................................................................... 2

      2.     Statement of Facts ........................................................................... 5

ARGUMENT ........................................................................................................... 14

I.      THE BANKRUPTCY JUDGE DID NOT ERR IN FINDING THAT THE
      APPELLANTS HAD MADE FRAUDULENT TRANSFERS UNDER G.L. c.109A, § 5 .
      ........................................................................................................... 15

      A.     The Evidence Warrants The Court's Findings That The Tangible Personal
             Property of LIS Was Fraudulently Transferred. ................................... 15

      B.     The Bankruptcy Judge Correctly Ruled That The Arclogix Software Platform,
             Which Was Developed By Sperbeck While An Officer Of And Employed By
             LIS, And The Continued Ability To Do Business With LIS' Customers, Were
             Corporate Opportunities Of The Debtor Diverted By Sperbeck, And As Such
             Constituted Property Of The Debtor's Estate, Subject To Turnover Pursuant To
             11 U.S.C. § 542 ................................................................................ 20

II.     THERE WAS NO ERROR IN THE BANKRPUTCY COURT'S RULING THAT
      ARCLOGIX WAS TO BE SUBSTANTIVELY CONSOLIDATED WITH THE
      DEBTOR ............................................................................................. 21

      A.     The Evidence Warrants a Finding That Arclogix is the Successor to the Debtor
             LIS ................................................................................................... 21

      B.     The Facts of Record Warrant Substantive Consolidation, As A Matter Of Law. 24

III.   THE BANKRUPTCY COURT DID NOT COMMIT REVERSIBLE ERROR BY
       EXCLUDING TESTIMONY CONCERNING THE MEDIATION BETWEEN THE
       DEBTOR AND APBLS. ........................................................................................ 29

       A.   Communications Made During A Mediation May Not Be Disclosed, And Are
            Inadmissible. ........................................................................................ 29

       B.   Even If Evidence Of The Statements Made During The Mediation Were
            Erroneously Excluded By The Bankruptcy Court, Any Such Error Was Harmless
            and Not Reversible. ................................................................................ 31

CONCLUSION ........................................................................................................ 33

# TABLE OF AUTHORITIES

## Cases

Aguiar v. Interbay Funding, LLC, 311 B.R. 129 (1st Cir. BAP 2004)............................................ 2

DeMoulas v. DeMoulas Supermarkets, Inc., 424 Mass. 501 (1997)............................................ 20

East Group Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245 (11th Cir. 1991).......... 25, 27

Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503 (1939)................................................................ 20

Hanson v. Bradley, 298 Mass. 371 (1937)................................................................................... 26

Hasbro, Inc. v. Serafino, 37 F. Supp.2d 94 (D. Mass.1999).......................................................... 15

In re Augie/Restivo Baking Co., 860 F.2d 515 (2d Cir. 1988)................................... 24, 25, 28, 29

In re Auto-Train Corp., Inc., 810 F.2d 270 (D.C. Cir. 1987) ................................................. 25, 27

In re Bonham, 229 F.3d 750 (9th Cir. 2000) ............................................................................... 24

In re Dehon, Inc., 2004 WL 2181669 (Bankr. D. Mass. 2004) ............................................. 24, 29

In re Gainsville P-H Properties, Inc., 106 B.R. 304 (Bankr. M.D. Fla. 1989)............................. 25

In re Hemingway Transport, Inc., 954 F.2d 1 (1st Cir. 1992) ................................................. 24, 28

In re Mars Stores, Inc., 150 B.R. 869 (Bankr. D. Mass. 1993) (Goodman, J.)............................ 28

In re Owens Corning, 419 F. 3d 195 (3d Cir. 2005).................................................................... 29

In re Smith and Kourian, 216 B.R. 686 (1st Cir. BAP 1997) ...................................................... 24

In re Snider Bros., Inc., 18 B.R. 230 (Bankr. D. Mass. 1982)..................................................... 25

In re Standard Brand Paints Co., 154 B.R. 563 (Bankr. C.D. Cal. 1993)................................... 25

In re Vecco Constr. Indus., Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) ......................................... 25

Leary v. Geoghan, 2002 WL 32140255 (Single Justice, Mass. App. Ct. 2002)......................... 29

Lubanski v. Coleco Indus., Inc., 929 F.2d 42 (1st Cir. 1991)....................................................... 32

Lynch v. City of Boston, 180 F.3d 1 (1st Cir. 1999) .................................................................... 31

McInnis v. A.M.F., Inc., 765 F.2d 240 (1985)............................................................................... 32

Milliken v. Duro Textiles, LLC, 451 Mass 547 (2008) ......................................................... 21, 22

My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968) ................................. 26

Palmer v. Murphy, 42 Mass. App. Ct. 334 (1997)....................................................................... 15

Rodriguez v. Montalvo, 371 F. Supp.2d 3 (D. Mass. 2005)......................................................... 15

Rubert-Torres ex rel. Cintron-Rupert v. Hospital San Pablo, Inc., 205 F.3d 472 (1st Cir. 2000) 31

Scott v. NG U.S. 1, Inc., 450 Mass. 760 (2008) .......................................................................... 26

Tiller v. Baghdady, 244 F.3d 9 (1st Cir. 2001)....................................................................... 31, 32

_Town of Clinton v. Geological Services Corp._, 21 Mass. L. Rep. 609 (2006 .............................. 30

_United States v. Gaines_, 170 F.3d 72 (1st Cir. 1999) .................................................... 32

## Statutes

11 U.S.C. § 542 ............................................................................................................. 20

Fed. R. Bankr. P. 8013 ............................................................................................. 1, 14

Fed. R. Civ. P. 61 ......................................................................................................... 31

Fed. R. Evid. 408 .......................................................................................................... 29

G.L. c. 109A § 5 ................................................................................................. 1, 3, 15, 17

G.L. c. 109A, § 2 .................................................................................................... 15, 17

G.L. c. 233, § 23(c) ....................................................................................................... 29

G.L. c.109A, §5(a)(1) .................................................................................................. 15

G.L. c.109A, §5(b) ....................................................................................................... 16

G.L. c.109A, §8(a) ....................................................................................................... 19

G.L. c.109A, §9(b) ....................................................................................................... 20

## Other Authorities

1 W.M. Fletcher, Cyclopedia of Corporations, _supra_ at § 43, at 292 ........................... 26

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The Appellee Joseph Braunstein, Chapter 7 Trustee of Logistics Information Systems, Inc. (the "Trustee") is satisfied with the Appellant's Statement of the Basis of Appellate Jurisdiction. The Appellants William E. Sperbeck and Arclogix, Inc. have timely appealed from the Bankruptcy Court's final judgment in an adversary proceeding, and the Bankruptcy Court's final order in a contested matter, over which this Court properly exercises appellate jurisdiction.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the Bankruptcy Court erred in ruling, after a trial on the merits, that the Defendant-Appellee made fraudulent transfers under G.L. c. 109A § 5, as to which the Trustee may recover from Sperbeck?

2.     Whether the Bankruptcy Court erred in ruling, after a trial on the merits, that Arclogix, Inc. is the successor to the Debtor, Logistics Information Systems, Inc.?

3.     Whether the Bankruptcy Court erred in ruling, after a trial on the merits, that Arclogix, Inc. should be substantively consolidated with the Debtor Logistics Information Systems, Inc. and as such is a consolidated debtor as of March 18, 2009?

4.     Whether the Bankruptcy Court erred in excluding testimony regarding settlement offers and discussions made in a mediation between the Debtor and APBLS, a party in which it was engaged in litigation at the time of such mediation, and if such evidence were improperly excluded whether the exclusion of such evidence constituted reversible error?

## STATEMENT OF THE APPLICABLE
## STANDARD OF APPELLATE REVIEW

"On an appeal the district court …may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.

1

P. 8013.  The Bankruptcy Court's findings of fact are reviewed for clear error, and its

conclusions of law are subject to *de novo* review.  Aguiar v. Interbay Funding, LLC, 311 B.R.

129, 131 (1st Cir. BAP 2004) (citations omitted).

## STATEMENT OF THE CASE

**1.    Procedural History**

On February 4, 2003, LIS filed a voluntary Chapter 7 petition and Jonathan Yellin was

appointed Chapter 7 Trustee.  On April 8, 2003 Jonathan Yellin, then the Chapter 7 Trustee, filed

a "Verified Expedited Motion against the Debtor, the Debtor's Successor and Fraudulent

Transferee Arclogix, Inc. and Debtor's Principal William E. Sperbeck, to Turnover the Assets,

Books and Records of the Debtor, and for Substantive Consolidation of Arclogix, Inc. as a

Debtor in these Proceedings, and for Injunctive Relief" (the "Substantive Consolidation

Motion").  On April 15, 2003, the Court (Kenner, U.S.B.J.) entered an order allowing the

Trustee's motion for preliminary injunction, ordering as follows:

> That William E. Sperbeck, his agents, servants, nominees, pledgees,
> assignees, attorneys, accountants and each and every one of them, be
> restrained and enjoined from selling, signing, dissipating, screening,
> concealing, transferring, using, spending, hypothecating, encumbering or
> in any way disposing of the assets of Logistics Information Systems, Inc.
> or of Arclogix, Inc. or of his financial interest in same, or in any of the
> books and records, source codes, furniture and fixtures, books and records
> and including, but not limited to, the sum of $300,000.00 presently being
> held in escrow with respect to the pending divorce proceeding between
> Mr. and Mrs. Sperbeck, until further order of this Court.

The Court also ordered that a trial on the issue of substantive consolidation would be held on the

filing of such request by either party.

On February 12, 2004, Jonathan Yellin resigned as Chapter 7 Trustee, and Joseph

Braunstein was appointed successor Chapter 7 Trustee.  On June 8, 2004, the Trustee filed an

Adversary Proceeding (Docket No. 04-1188), seeking to recover damages from Sperbeck and

Arclogix for fraudulent transfers, and on the basis of successor liability and corporate veil piercing.

On November 19, 2004, LIS filed a voluntary motion to dismiss the Chapter 7 bankruptcy. On January 11, 2005, the Court (Somma, U.S.B.J.) denied the Debtor's voluntary motion to dismiss, but required the Trustee to move for relief from stay to intervene in the Middlesex Action (as defined below), and to obtain an assessment of damages, liquidating APBLS' claim against LIS. In that order, the Court stayed the Adversary Proceeding and Substantive Consolidation Motion, which was then a pending contested matter. The Trustee moved for relief from stay on January 27, 2005, with the assent of the Debtor, and the Court allowed the Trustee's motion by order dated January 29, 2005. On October 17, 2007, following the entry of a final judgment against LIS in the Middlesex Action, the Court lifted the stay of the Adversary Proceeding and the contested matter.

On August 6, 2008, the Court ordered that an evidentiary hearing on the Substantive Consolidation Motion be combined with the trial in the Adversary Proceeding. The Court (Rosenthal, U.S.B.J.) conducted an evidentiary hearing of these matters on October 16 and 17, 2008. On March 18, 2009, following the submission of post trial requests for findings of fact and rulings of law, the Court issued a Memorandum and Order, a copy of which attached as Appendix A:

- Finding that all payments and other transfers of assets made by LIS to or for the benefit of Arclogix are avoidable by the Trustee as fraudulent pursuant to G.L. c. 109A, § 5, and are recoverable by the Trustee.

- Entering judgment for the Trustee against Sperbeck in the amount of $254,163.50.

- Entering judgment for the Trustee against Sperbeck, requiring Sperbeck to turnover the sum of $254,163.50.

- Entering judgment requiring Arclogix to turn over the Trustee all assets of Logistics' estate.

- Entering judgment for the Trustee against Sperbeck in the amount of $424,499.

- Entering judgment for the Trustee as follows:  (1) of the balance held in the Wellesley Bank Account, $95,000 is declared to be property of the bankruptcy estate of Logistics Information Systems, Inc., and (2) the Plaintiff may reach and apply the balance of the Wellesley Bank Account less $95,000, to satisfy Sperbeck's obligations to the Trustee.

- Declaring that Arclogix is the successor of LIS.

- Finding that Sperbeck had diverted corporate opportunities of LIS.

- Finding that Sperbeck must reimburse the Estate for excess compensation from Arclogix in violation of the Court's April 15, 2003 Order.

- The Court further ruled that in lieu of money judgment, Arclogix was to be substantively consolidation with LIS, and entered a separate order in the main case.

The Court entered an amended judgment entered, pursuant to the Memorandum and Order on April 13, 2009, a copy of which is attached as Appendix B.[1] Sperbeck and Arclogix filed timely notices of appeal from the Judgment, and the final order in the Substantive Consolidation Motion.

---

[1] The final judgment was amended to reflect the assessment of prejudgment interest.

4

2.   **Statement of Facts**

*i.  Background*

Logistics Information Systems, Inc. ("LIS") was organized under the laws of the State of

Delaware on March 24, 1994 and was registered to do business in this Commonwealth on May 9,

1994 (Exhibit 1, ¶ 2).  The Defendant, William E. Sperbeck ("Sperbeck"), started a business

called Logistics Information Systems in the 1980s, and operated it as a sole proprietorship until

1994, when it was incorporated as a sub-chapter S corporation (Trial Transcript, Day 1, Page

151, hereinafter, e.g., "Tr. 1:151").  At all relevant times, Sperbeck was an officer, director, and

principal shareholder of LIS, and served as president of LIS at all times, both when it was

operated as a sole proprietorship and when it was incorporated (Exhibit 1, ¶ 7 and Tr. 1:151-

152).  LIS was in the transportation management business, and in the course of its business

created specialized transportation management software, including marketing and licensing

software products, including those known as "Max Payload" and "Auditlogic" (Exhibit 1, ¶ 6;

Tr. 1:42, 2:105).

In August, 1999, LIS commenced a lawsuit against American President Business

Logistics Services, Ltd. ("APBLS"), and its parent company, in Middlesex Superior Court (the

"Middlesex Action"), claiming that they had violated a Software Licensing Agreement with LIS,

concerning APBLS's use of the Max Payload software.  APBLS filed an Answer and

Counterclaim alleging, among other things, that LIS has misrepresented the capabilities of its

software (Exhibit 1, ¶ 8).

*ii. The Formation of Arclogix.*

Sperbeck formed Arclogix, Inc. as a Delaware corporation on September 13, 2000, and

was registered to do business in Massachusetts on January 3, 2001 (Exhibit 1, ¶ 5).  Sperbeck has

been the president of Arclogix since its inception (Tr. 1:154).  Sperbeck's game plan in forming

Arclogix was to create a new company to offer transportation management software with a more modern look and feel that than offered by LIS (Tr. 1:154). Arclogix was formed to move LIS clients to a new platform (Tr. 1:54-55). Additionally, Sperbeck intended Arclogix to be set up a company with no assets, in order to pass off ownership to employees of the company (Tr. 1:155-156). When Sperbeck incorporated Arclogix in September 2000, he did so with the intention of shutting down LIS (Tr. 1:55). He planned on ceasing operations of LIS at the end of December 2000, and starting Arclogix' operations at that time (Tr. 1:159).

LIS continued to operate as a functioning company between September 2000, when Arclogix was formed, and January 2001, when Arclogix started active operations (Tr. 1:160). Sperbeck was working on the Arclogix software platform problem between September 2000 and January 2001, while still employed with, and still president of, LIS (Tr. 1:157, 1:160-1:161). Sperbeck, Doherty and Fyler worked on the Arclogix software platform while employed with LIS, and while LIS was still in existence (Tr. 1:56). Arclogix has not sold any new product to any client since its formation (Tr. 1:163).

Susan Cahoon ("Cahoon"), Sperbeck's former wife was treasurer, shareholder and director of Arclogix, paid the bills, did the payroll and billed the clients, and otherwise performed the accounting functions for Arclogix as she had performed for LIS (Tr. 1:45). The Arclogix software platform developed by Sperbeck and the other LIS employees performed the same functions as the LIS software, "plus more things and did it all better" (Tr. 2:67).

### iii. The Fraudulent Transfers from LIS to Sperbeck

Sperbeck caused LIS to pay him a total of $254,163.50 between December 2000 and August 2001 (Tr. 1:198-1-199). He did so to hinder, delay and defraud the creditors of LIS, particularly APBLS. On December 11, 2000, LIS paid Sperbeck $100,000.00 (Exhibit 2). On January 4, 2001, LIS paid Sperbeck $113,000.00 (Exhibit 3). On June 14, 2001, LIS paid

Sperbeck $10,000.00 (Exhibit 4). On August 17, 2001, Cahoon, as treasurer of LIS, closed LIS'
bank account at Fleet, which at the time had a balance of $1,141.55, and paid such remaining
funds to Sperbeck (Exhibit 9, Tr. 1:66). On or about December 11, 2000, Sperbeck paid
Arclogix $100,000.00 (Exhibit 5). On January 4, 2001, Sperbeck paid Arclogix $113,000.00
(Exhibit 5). On June 13, 2001 Arclogix paid LIS $30,021.95 (Exhibit 6). The June 13, 2001
payment represented Arclogix' purchase price for LIS assets, including computers, furniture and
intellectual property (Exhibit 6, 7). On June 13, 2001, LIS paid Sperbeck $30,021.95 (Exhibit
8).

### *iv. LIS' Bankruptcy*

APBLS obtained a judgment on its counterclaim against LIS in the Middlesex Action in
the amount of $1,498,121.71. Judgment and Execution was issued against LIS on March 14,
2002 (Exhibit 1, ¶ 9). On February 3, 2003, LIS filed for relief under Chapter 7 of the United
State Bankruptcy Code (Exhibit 1, ¶ 10). Joseph Braunstein was appointed Chapter 7 Trustee of
LIS (Exhibit 1, ¶ 1). In filing its Chapter 7 petition, LIS stated that "the Debtor has had no
revenue of any kind for two years. No property has been transferred either absolutely or as
security within one year immediately preceding the commencement of this case" (Exhibit 20).
Sperbeck, as president of LIS, signed LIS' bankruptcy petition under the penalties of perjury
(Exhibit 20).

### *v. The Formation of T-Logix*

T-Logix is a corporation organized and existing under the laws of the State of Delaware,
for the purpose or marketing Arclogix, of which Sperbeck is the sole officer, director and
shareholder (Exhibit 1, ¶ 13-14). Sperbeck sought to close down the business of Arclogix on or
at the end of 2001 (Exhibit 17). On March 20, 2002, Sperbeck loaned T-Logix the sum of
$300,000.00, pursuant to a Promissory Note with interest at a rate of 5% per annum (Exhibit 11).

On or about April 9, 2002, Sperbeck opened a bank account in the name of T-Logix, Inc. at Wellesley Cooperative Bank (Exhibit 18).  On or about August 16, 2002, Sperbeck transferred the funds in the T-Logix account at Wellesley Cooperative Bank, in the amount of $302,113.74, to a new account at Citizens Bank (Exhibit 18).  As of February 28, 2003, the T-Logix account at Citizens Bank had a balance of $291,656.43 (Exhibit 18).

### vi. Arclogix Carried on the Business of LIS

Arclogix was in the business of creating specialized transportation management software (Tr. 1:44).  LIS and Arclogix were in the same business, providing software with the same function to the same set of clients (Tr. 1:153-1:154).  Arclogix had the same employees as LIS when it started up (Tr. 1:46).  On February 12, 2001, Cahoon notified Verizon that as of January 1, 2001, "Logistics Information Systems, Inc. has changed its name to Arclogix, Inc." (Tr. 1:61; Exhibit 10).  Arclogix used the same telephone number and Verizon billing information as had been used by LIS at the same installation and service address of 170 Worcester Road, Wellesley, Massachusetts (Exhibit 10).

Richard Bennett, the accountant for LIS, was only requested to calculate the net book value of the assets sold by LIS to Arclogix, not fair market value (Tr. 1:113).  The majority of the assets sold by LIS to Arclogix was intellectual property, which were expensed for tax purposes so had no tax book value (Tr. 1:117).  LIS recorded, as payroll costs for developing software, the sum of $559,938.00 as of the end of 2000 (Tr. 1:120).  No monetary value was assigned to the intellectual property conveyed by LIS to Arclogix (Tr. 1:121 - 1:122).  Arclogix paid no consideration for the intellectual property of LIS.

Despite not beginning operations until after January 1, 2001, Arclogix' balance sheet reflected an account receivable of $200,201.00 as of December 31, 2000 (Tr. 1:123-1:124 and Ex. 44).  The initial balance sheet for Arclogix, dated as of December 31, 2000, is entitled

8

"Arclogistics" (Tr. 1:130). The balance sheet for Arclogix as of December 31, 1999 is virtually identical to the balance sheet for LIS as of December 31, 1999, and incorporates LIS' financial reporting on a going-forward basis (compare Exhibits 46 and 13). Arclogix balance sheet as of December 31, 2000 reflects computer software expense of $559,938, the same amount reflected on LIS' balance sheet as of December 31, 2000 (compare Exhibits 46 and 13).

In 2002, Arclogix held itself out on its website as being formerly known as LIS (Exhibit 21). On or before November 6, 2000, LIS/Arclogix advertised for a position for a visual basics software developer (Exhibit 22). LIS noted in its advertisement that "Arclogix carries forward from the LIS software suite, the advanced functionality of that [transportation management software] including the load and route optimization of inbound and outbound shipment planning and a pipeline view of the status of shipment" (Exhibit 22). In 2002, Arclogix announced the beginning phases of installation of the Max Payload Client/Server version of its inbound (back haul) system at Save-A-Lot's headquarters in suburban St. Louis, Missouri (Exhibit 24).

On June 4, 2001, Arclogix entered into a Maintenance Contract with Save-A-Lot (Exhibit 25). The June 4, 2001 maintenance contract between Save-A-Lot and Arclogix incorporated by reference a License Agreement dated April 19, 1999 (Exhibit 25). On April 19, 1999, LIS had entered into a License Agreement with Save-A-Lot, granting Save-A-Lot a nonexclusive license to use the current version of its software/data for a period of 39 years unless otherwise terminated earlier by Save-A-Lot (Exhibit 26).

In 2002, Arclogix announced that Saks, Inc. purchased LIS MaxPayload and Audit-Logic Version 6.0 (Exhibit 28). On or about September 10, 1999, LIS and Saks had entered into a License Agreement, pursuant to which LIS granted Saks a license to use the current version of its software/data for a period of 39 years unless terminated earlier by Saks (Exhibit 29). Under the

terms of the License Agreement, Saks was licensed, and provided first year's maintenance, for

LIS' MaxPayload and Audit-Logic software (Exhibit 29). Arclogix prepared a Systems

Definition Document for Saks on or about March 24, 2000 (Exhibit 32). The Systems Definition

Document was the result of a series of conference room pilot meetings between Saks and

Arclogix beginning in early 1999 and continuing as of the date of the document. Arclogix,

however, was not formed until September 2000, and LIS was operating actively from 1999

through December 30, 2000. (Exhibit 32).

On or about October 2, 2001, Arclogix made an informational presentation to Dillard's

Department Stores, Inc. (Exhibit 34). In its informational presentation, Arclogix stated that "the

rationale for forming Arclogix was to signal the transportation management system (TMS) user

public that Arclogix was to offer the software of LIS with web-based components and as an

ASP" (Exhibit 34, page 3). In its October 2, 2001 presentation to Dillard's, Arclogix stated that

"LIS is the leading software company providing transportation management solutions to the

retail industry" (Exhibit 34, page 3).

In its October 2, 2001 informational presentation to Dillard's, Arclogix noted that

"Logistics Information Systems, Inc. (Arclogix) has a commitment to the retail industry with

over half of its commercial installations retailers, and its software, Max Payload for Retail™,

designed specifically for retailers," and "evidence of LIS/Arclogix' commitment to the retail

industry has been its long association with the industry's two leading retail trade groups:

National Retail Federation (NRF) and International Mass Retail Association (IMRA)" (Exhibit

34, page 5). In its presentation to Dillard's, Arclogix stated as follows as its "upgrade strategy:

> Arclogix does not have a single release of RTMS, but rather (4) each with
> a different underlying technology and functional capability. The current
> release is for Max Payload, Fleet Optimization and Audit Logic (and their
> related systems) are:

- Max Payload/Audit Logic, Version 5.0 and subsequent releases, first released in 1998, and installed then.
- Max Payload/Audit Logic, Fleet Optimization et al 6.0 and subsequent releases, first released in mid-1999 and installed in late 1999.
- Max Payload Inbound/Outbound 7.0, first released and installed in 1999, but currently scheduled for a mid to late 2001 replacement for version 5.0.
- TradeRoute an ASP, (built on MaxPayload, et al) and now in early in-house beta testing, along with the web interfaces (e.g., carrier, vendor) part of Max Payload.

Arclogix scheduled new releases with each version annually, usually at the beginning of the calendar year (Exhibit 34, page 8).

On March 26, 2001, Arclogix entered into a Maintenance Contract with Foamex International, Inc. (Exhibit 35). The March 26, 2001 Maintenance Contract between Foamex and Arclogix incorporated all conditions on the original License Agreement dated June 2, 1997. On June 2, 1997, Logistics Information Systems and Foamex had entered into a License agreement, pursuant to which LIS granted Foamex a non-exclusive license to use certain software and data identified in the contract, including Max Payload, Ratelogic and Auditlogic (Exhibit 36).

On March 6, 2005, Arclogix entered into a Maintenance Contract with Bon Ton Stores (Exhibit 37). The March 6, 2005 Maintenance Contract between Bon Ton and Arclogix is incorporated by reference in original License Agreement dated September 9, 1996 (Exhibit 37). On September 9, 1996, Bon Ton had entered into a License Agreement with LIS, pursuant to which LIS granted Bon Ton a license to use certain software, including Max Payload and Ratelogic (Exhibit 38).

On or about March 26, 2001, Arclogix entered into a Maintenance Contract with TJX (Exhibit 39). The March 26, 2001 Maintenance Contract between TJX and Arclogix incorporated the terms of an original license agreement dated May 12, 1994 (Exhibit 39). On May 12, 1994, LIS had entered into a License Agreement with TJX, granting TJX a license for certain software, including Max Payload and Routelogic (Exhibit 40).

On October 1, 2001, Arclogix entered into a Maintenance Contract with Kimball International, Inc. (Exhibit 41). The October 1, 2001 maintenance contract between Kimball and Arclogix incorporated the terms of an original License Agreement dated September 10, 1996 (Exhibit 41). On September 10, 1996, Kimball had entered into a license agreement with LIS, pursuant to which LIS granted Kimball a license to use certain software, including Max Payload, Ratelogic and Auditlogic (Exhibit 42).

On January 23, 2001, Sperbeck, on behalf of Arclogix, sent a letter to Joseph Wallau of Kohl's Department Stores, Inc., serving as notice of the change of ownership of the Logistics Information System License Agreement and Maintenance Contract between Kohl's and LIS, noting that Arclogix had purchased the assets and intends to honor the terms of the agreements and the maintenance contract (Exhibit C).

Arclogix continued to serve LIS clients pursuant to the terms of license agreements between LIS and the client. There are no documents by which LIS assigned its rights to license agreements and maintenance contracts to any of its customers to Arclogix (Tr. 2:71). LIS trademarked AuditLogic and MaxPayload software, and no documentation transferred the trademarks from Logistics to Arclogix (Tr. 2:105).

### *vii. Sperbeck's and Arclogix' Violations of the Court's April 15, 2000 Order*

On April 15, 2003 the Court entered an Order Granting Preliminary Injunction (Exhibit 54), which provides in relevant part as follows:

12

That William E. Sperbeck, his agents, servants, nominees, pledgees, assignees, attorneys, accountants and each and every one of them, be restrained and enjoined from selling, signing, dissipating, screening, concealing, transferring, using, spending, hypothecating, encumbering or in any way disposing of the assets of Logistics Information Systems, Inc. or of Arclogix, Inc. or of his financial interest in same, or in any of the books and records, source codes, furniture and fixtures, books and records and including, but not limited to, the sum of $300,000.00 presently being held in escrow with respect to the pending divorce proceeding between Mr. and Mrs. Sperbeck, until further order of this Court.

As of February 28, 2003, the T-Logix account at Citizens Bank had a balance of $291,656.43 (Exhibit 18). Sperbeck transferred the funds on deposit in the T-Logix account at Citizens to an account at Wellesley Bank (Exhibit 47). As of October 16, 2008, the account holding the former deposits of the T-Logix account held deposits of $280,641.26 (Exhibit 47).

The April 15, 2003 Order further provides:

That Arclogix, Inc. and William E. Sperbeck and their officers, agents, directors, servants, assignees, nominees, accountants, attorneys, pledgees and each and every one of them, be restrained and enjoined from selling, assigning, alienating, transferring, concealing, pledging, mortgaging or in any manner encumbering or disposing of the assets of Arclogix, Inc. or assets formerly belonging to the Debtor outside the ordinary course of business and from making any distribution to Mr. Sperbeck other than his current salary of $60,000.00 annually.

Sperbeck received compensation from Arclogix in the amount of $68,906.00 in 2003 (Exhibit 49). Sperbeck received compensation from Arclogix in 2004 in the amount of $162,910.00 (Exhibit 50). Sperbeck received compensation from Arclogix in 2005 in the amount of $111,100.00 (Exhibit 51). Sperbeck received compensation from Arclogix in 2006 in the amount of $217,583.00 (Exhibit 52). Sperbeck received compensation from Arclogix in 2007 in the sum of $164,000.00 (Exhibit 53). Sperbeck received compensation for Arclogix between 2003 and 2007 in an amount $424,490 greater than the $60,000 per year permitted under the Court's order.

# **ARGUMENT**

The Bankruptcy Judge's decision principally rests on factual findings made during trial based on evidence submitted, testimony and credibility of the witnesses. The Appellants' challenges to the Bankruptcy Court's rulings are largely challenges to the Judge's findings of fact, which were amply supported by the evidence. "Findings of fact … shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." See Fed. R. Bankr. P. 8013.

At the outset of his decision, the Bankruptcy Judge explicitly stated the Court did not find the Appellants' principal witness, Sperbeck to be convincing or credible. Indeed, the Bankruptcy Judge specifically noted that Sperbeck's explanations of the creation of Arclogix and T-Logic were superficial and lacking in substance. Additionally, he "demonstrated a demeanor that the Court found suggestive of less than forthright answers". Memorandum of Decision, p.2. The Appellants fail to show any erroneous findings of fact in their brief, and instead urge this Court to accept the testimony of the defendant's witness's at trial, despite the judge's findings regarding credibility. The Bankruptcy Judge, who had the opportunity to observe Sperbeck's testimony and his demeanor on the witness stand, was well within his discretion to make an adverse credibility determination and the application of such determination to the facts of this case was not clearly erroneous.

## I.  THE BANKRUPTCY JUDGE DID NOT ERR IN FINDING THAT THE APPELLANTS HAD MADE FRAUDULENT TRANSFERS UNDER G.L. C. 109A, § 5.

### A.  The Evidence Warrants The Court's Findings That The Tangible Personal Property of LIS Was Fraudulently Transferred.

The Bankruptcy Court did not err in finding the Debtor Logistics Information Systems, Inc. ("LIS") and Sperbeck made fraudulent transfers to Arclogix and Sperbeck pursuant to G.L. c.109A, §5(a)(1).   The Court found that the repayment of loans to Sperbeck by LIS in late 2000 and early 2001, were fraudulent transfers as Logistics had at least one creditor.   APBLS had a known counterclaim filed against Logistics and thus was the holder of a claim as defined under G.L. c. 109A, § 2.  Furthermore, the Bankruptcy Court held that Logistics fraudulently transferred of all assets, including intellectual property, to Arclogix. All funds and assets were transferred from Logistics to Sperbeck or Arclogix, such that no assets were left in LIS to satisfy the claim of APBLS, or any other creditor.

The Massachusetts Uniform Fraudulent Transfer Act provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor." G.L. c.109A, §5(a)(1).  Such "actual intent" is commonly proven "circumstantially and inferentially." Rodriguez v. Montalvo, 371 F. Supp.2d 3, 5-6 (D. Mass. 2005); Hasbro, Inc. v. Serafino, 37 F. Supp.2d 94, 98 (D. Mass.1999); see Palmer v. Murphy, 42 Mass. App. Ct. 334 (1997) (discussing "actual intent" to defraud, under prior version of the statute).  The Act suggests eleven factors that a court may consider in determining whether "actual intent" to hinder, delay or defraud was present:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the

15

transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor

G.L. c.109A, §5(b)

The evidence presented at trial reflects several fraudulent transfers of the assets of LIS. LIS transferred $254,163.50 to Sperbeck between December 2000 and June 2001. Sperbeck in turn used $213,000 to capitalize Arclogix in late 2000 and early 2001. In late December 2001, Sperbeck caused himself to be paid $345,000 from Arclogix, including the $213,000 that he received from LIS and purportedly loaned to Arclogix, plus $15,392 in interest on that loan, as well as a "bonus" of $117,000. Sperbeck then created T-Logix, which he funded with $300,000, including the money he received from Arclogix. LIS transferred all of its assets, both tangible and intangible, to Arclogix, which had been using such assets in its own business since at least January 2001, when it commenced operations, for $30.021.95 in June 2001.

The intellectual property of LIS was allegedly transferred to Arclogix, but there is no documentary reference whatsoever to such assertion. While "IP" appears in the memo section of the June 14, 2001 Arclogix check to LIS, no consideration was given for the transfer of such intellectual property. Bennett, Sperbeck's accountant, testified that the intellectual property had no tax book value, but that it had a fair market value as to which he was not qualified to opine (Tr. 1:118-121, Exhibit 14). There are no documents transferring title to either the licensed software or LIS' registered trademarks (e.g., "Maxpayload," "Audit Logic," and "Trader Router").

16

Arclogix continued to serve LIS' customers pursuant to License Agreements between LIS and its former clients (Exhibits 24-29, 35-42). There is no documentation assigning LIS' contract rights, which Arclogix clearly assumed, and which generated aggregate income for Arclogix of $2,053,016 between 2003 and 2007 (Exhibits 4-53, total of Line 11 on each return). All of Arclogix' income during these years was derived from its servicing of LIS' former customers, since Arclogix never sold any new product to any client after its formation (Tr. 1:163). LIS' intellectual property rights are assumed to be assigned; they were assigned fraudulently, and are recoverable by the Trustee, as discussed above.

Many of the earmarks of a transfer made "with actual intent to hinder, delay, or defraud any creditor of the debtor," as expressly enumerated in G.L. c.109A, §5, are present in these transfers.

- "The transfer or obligation was to an insider" as both Sperbeck and Arclogix are "insiders" to LIS, as defined in G.L. c.109A, §2.

- "The debtor retained possession or control of the property transferred after the transfer." While LIS technically ceased to exist as an entity, Arclogix carried on the very same business as LIS, for the same clients, with the same employees and telephone number, from the same location, pursuant to the same contracts.

- "The transfer or obligation was disclosed or concealed." Some vendors were informed that the change from LIS to Arclogix was merely a name change, and LIS' former clients were assured of continuity of service by Arclogix.

- "Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." The formation of Arclogix and the transfer took place while the Middlesex Action - which ultimately resulted in a judgment

17

against LIS in excess of $1.5 million – was pending. This suit gave rise to the very obligation LIS has sought to avoid. Sperbeck testified that he intended to leave LIS without assets against which APBLS could collect if judgment were entered against it (Tr. 1:198-199):

> Q: ...And for a period of time Foley/Hoag continued to prosecute the case on behalf of [LIS]. . .with the hope of recovering against [APBLS].
>
> A: I suspect that would be the case.
>
> Q: Yeah. But you hedged your bets there, though, didn't you? Because [LIS] didn't have any more assets, correct?
>
> A: Correct.
>
> Q: So if [APBLS] were to recover against [LIS] there'd be no assets to proceed against, correct?
>
> A: Exactly.

- "The transfer was of substantially all the debtor's assets." There is no question that it was fully intended by LIS and Sperbeck that all of the assets of LIS be transferred to Arclogix.

- "The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." LIS, the function of which was to design and license software, received no consideration for the transfer of its intellectual property, the primary and most valuable asset being assigned to Arclogix.

- "The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." LIS operated at a substantial deficit in the last quarter of 2000, and was left with no assets whatsoever after the business was transferred to Arclogix.

- "The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."  Sperbeck claims that the $254,163.50 he received from LIS was in repayment of a loan.  He then transferred at least $213,000 of those funds, along with all of the tangible and intangible assets of LIS, to Arclogix, an insider.

In his decision, the Bankruptcy Judge specifically found Sperbeck's testimony regarding the reasons for creating Arclogix not to be convincing or credible.  Additionally, the evidence before the Bankruptcy Judge was more than sufficient to support a finding of fraudulent intent on the part of Sperbeck.  Such evidence included Sperbeck's admission that the APBLS claim was on his mind when he implemented his plans; the lack of corroboration of claim that unnamed attorney advised him to create Arclogix as a way to give employees stock; notice of the name change of LIS to Arclogix; the testimony regarding the name change; notice to vendors and customers of the name change; and non-payment for contracts or intellectual property held by LIS.  See Memorandum of Decision, p.4.  The Bankruptcy Judge noted that every vendor, employee, accountant, and contracting party was notified of the intent to continue the LIS business under the name of Arclogix, except APBLS.  The judge's factual findings supported his decision that fraudulent transfers occurred, were not clearly erroneous, and thus should be affirmed.

The Bankruptcy Court's findings of fact are amply supported by the evidence, and support the judgment that the Trustee is entitled to recover $254,163.50 from both Sperbeck and Arclogix, and to avoid the fraudulent transfer of all of LIS' remaining tangible and intangible assets of LIS, including its equipment, computers and intellectual property, and recover such property from Arclogix pursuant to G.L. c.109A, §8(a).  Each of these fraudulent transfers is

voidable by the Trustee pursuant to G.L. c.109A, §9(b).  The Bankruptcy Court correctly ruled that cash withdrawn from LIS may be recovered from Sperbeck, as the first transferee of the asset, and from Arclogix, as the subsequent transferee, which was not a good faith transferee which took for value.  Id.  Additionally, the fraudulently conveyed tangible and intangible assets may be recovered directly from Arclogix by the Trustee.  There is no error in the Bankruptcy Court's findings that the Trustee is entitled to recover such fraudulent transfers.

**B.** **The Bankruptcy Judge Correctly Ruled That The Arclogix Software Platform, Which Was Developed By Sperbeck While An Officer Of And Employed By LIS, And The Continued Ability To Do Business With LIS' Customers, Were Corporate Opportunities Of The Debtor Diverted By Sperbeck, And As Such Constituted Property Of The Debtor's Estate, Subject To Turnover Pursuant To 11 U.S.C. § 542.**

A corporate opportunity is any opportunity to engage in a business activity of which a director, senior executive, or shareholder of a closely held corporation becomes aware either in connection with performing the functions of those positions or through the use of corporate information or property, if the resulting opportunity is one that the director, senior executive or shareholder in a closely held corporation should reasonably be expected to believe would be of interest to the corporation.  DeMoulas v. DeMoulas Supermarkets, Inc., 424 Mass. 501, 530 (1997).  Here, a corporate opportunity must both be within LIS' line of business and one in which LIS has an interest or reasonable expectancy.  Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503 (1939).

The opportunity to improve upon the transportation management software developed and licensed by LIS was a corporate opportunity of LIS.  Sperbeck used this opportunity for the benefit of Arclogix.  Indeed, the Arclogix software platform was developed by Sperbeck, David Doherty and Silas Fyler while all were employed by LIS, and before Arclogix had started active operation (Tr. 1:157, 1:160-161).  It was developed for the express purpose of diverting business

away from LIS to Arclogix (Tr. 1:54-55, 1:154).  Similarly, the opportunity to do business with

LIS' existing customer base, utilizing LIS employees, was an opportunity of LIS that was

diverted by Sperbeck to Arclogix (Tr. 1:55, 1:159).

Sperbeck committed a breach of his fiduciary duty to LIS by permitting the corporate

opportunity to enhance the LIS software platform to be diverted to Arclogix, which in turn used

the enhanced software to service LIS' existing customer base.  Pursuant to Section 11 U.S.C. §

542 the Trustee is entitled to the turnover of this property to the estate.  Thus, the bankruptcy

judge did not err in finding the Trustee is entitled to recover the full benefit of the corporate

opportunity diverted to Arclogix from Sperbeck, and is permitted to reach and apply his interest

in Arclogix.[2]

## II.   THERE WAS NO ERROR IN THE BANKRPUTCY COURT'S RULING THAT ARCLOGIX WAS TO BE SUBSTANTIVELY CONSOLIDATED WITH THE DEBTOR.

### A.   The Evidence Warrants a Finding That Arclogix is the Successor to the Debtor LIS.

The Bankruptcy Judge did not err in finding that Arclogix is the successor to LIS.

Determinations of successor liability are wholly fact specific.  Milliken v. Duro Textiles, LLC,

451 Mass 547, 559 (2008).  The factors that courts generally consider in determining whether a

de facto merger warranting successor liability is present are whether:

- there is a continuation of the enterprise of the seller corporation so

  that there is continuity of management, personnel, physical

  location, assets, and general business operations;

---

[2]  This argument provides further support for the Bankruptcy Court's finding that Arclogix should be substantively consolidated with LIS, as discussed below.

- there is a continuity of shareholders which results from the
  purchasing corporation paying for the acquired assets with shares
  of its own stock, this stock ultimately coming to be held by the
  shareholders of the seller corporation so that they become a
  constituent part of the purchasing corporation;

- the seller corporation ceases its ordinary business operations,
  liquidates, and dissolves as soon as legally and practically possible;
  and

- the purchasing corporation assumes those obligations of the seller
  ordinarily necessary for the uninterrupted continuation of normal
  business operations of the seller corporation.

Milliken, 451 Mass at 557.

Substantial evidence in the record supports the Bankruptcy Court's finding that Arclogix is the successor of Logistics – and, indeed, that the entities were one and the same. There is a continuation of the "enterprise of the seller corporation" so there is "continuity of management, personnel, physical location, assets, and general business operations," as Arclogix had the same officers, directors, principal shareholder, and the same employees, and even the same telephone number, as LIS when it started up (Tr. 1:46). Arclogix purchased computers, supplies and office furniture from Logistics. Additionally, no monetary value was assigned nor was consideration paid for the intellectual property conveyed by LIS to Arclogix (Tr. 1:121 - 1:122).

Arclogix financial statements mirrored those of Logistics. Despite not beginning operations until after January 1, 2001, Arclogix' balance sheet reflected an account receivable of $200,201.00 as of December 31, 2000 (Tr. 1:123-1:124 and Ex. 44). The initial balance sheet for

22

Arclogix, dated as of December 31, 2000, is entitled "Arclogistics" (Tr. 1:130). Arclogix balance sheet as of December 31, 2000 reflects computer software expense of $559,938, the same amount reflected on LIS' balance sheet as of December 31, 2000 (compare Exhibits 46 and 13).

On February 12, 2001, Cahoon notified Verizon that as of January 1, 2001, "Logistics Information Systems, Inc. has changed its name to Arclogix, Inc." (Tr. 1:61; Exhibit 10). Arclogix used the same telephone number and Verizon billing information as had been used by LIS at the same installation and service address of 170 Worcester Road, Wellesley, Massachusetts (Exhibit 10).

Additionally, the seller corporation, LIS, ceased its ordinary business operations, liquidated, and dissolved as soon as legally and practically possible. When Sperbeck incorporated Arclogix in September 2000, he did so with the intention of shutting down LIS (Tr. 1:55). He planned on ceasing operations of LIS at the end of December 2000, and starting Arclogix' operations at that time (Tr. 1:159). And the purchasing corporation, Arclogix, assumed the obligations of the seller, LIS, for the uninterrupted continuation of normal business operations of the seller corporation. LIS continued to operate as a functioning company between September 2000, when Arclogix was formed, and January 2001, when Arclogix started active operations (Tr. 1:160).

Sperbeck's two companies were in the same business, providing software with the same function to the same set of clients (Tr. 1:153-1:154). The Arclogix software platform developed by Sperbeck and the other LIS employees performed the same functions as the LIS software, "plus more things and did it all better" (Tr. 2:67). Arclogix has not sold any new product to any

client since its formation (Tr. 1:163).  Arclogix continued to serve the clients of LIS after notifying them of a change in the company's name from LIS to Arclogix.

In 2000, LIS/Arclogix advertised for a position for a visual basics software developer (Exhibit 22).  LIS noted in its advertisement that "Arclogix carries forward from the LIS software suite, the advanced functionality of that [transportation management software] including the load and route optimization of inbound and outbound shipment planning and a pipeline view of the status of shipment" (Exhibit 22).  Lastly, in 2002, Arclogix held itself out on its website as being formerly known as LIS (Exhibit 21).

The record clearly evidences successor liability and the trial judge did not err in his ruling that LIS is the successor to Arclogix.

## B.     The Facts of Record Warrant Substantive Consolidation, As A Matter Of Law.

The authority of a Bankruptcy Court to substantively consolidate the estates of multiple entities is not specifically provided in the Bankruptcy Code, but derives from the Court's equitable and general powers.  In re Bonham, 229 F.3d 750, 764 (9th Cir. 2000) ("[T]he power of substantive consolidation derives from the bankruptcy court's general equity powers as expressed in [section] 105 of the Bankruptcy Code"); In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988) (substantive consolidation is within the court's equitable powers); see also 2 COLLIER ON BANKRUPTCY §105.09[1][b] (15th ed. rev. 2007).  Despite the absence of a specific Bankruptcy Code provision regarding substantive consolidation, courts, including courts within the First Circuit, are willing to allow debtors to substantively consolidate their cases under certain circumstances.  See In re Dehon, Inc., 2004 WL 2181669 (Bankr. D. Mass. 2004); In re Smith and Kourian, 216 B.R. 686 (1st Cir. BAP 1997) (substantive consolidation permissible); In re Hemingway Transport, Inc., 954 F.2d 1 (1st Cir. 1992) (in dicta, describing

broad factors for allowing substantive consolidation); In re Snider Bros., Inc., 18 B.R. 230

(Bankr. D. Mass. 1982).

       The doctrine of substantive consolidation was formerly compared to a corporate "veil

piercing" analysis.  See In re Standard Brand Paints Co., 154 B.R. 563, 567 (Bankr. C.D. Cal.

1993) (citations omitted) (discussing history of doctrine).  Implicit in such analysis is an

examination of whether there was, *inter alia*, "fraud or neglect of corporate formalities and

accounting procedures."  Id. at 568.  Additional factual considerations include:  degree of

difficulty in segregating assets and liabilities; presence of consolidated financial statements;

increased profitability due to consolidation at a single physical location; commingling of assets

and business functions; unity of interests and ownership; existence of inter-corporate guarantees

or loans; and transfer of assets without observance of corporate formalities.  In re Vecco Constr.

Indus., Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980).

       A decision in favor of substantive consolidation need not be supported by the presence of

all seven "Vecco factors," which serve as "examples of information that may be useful to courts

charged with deciding whether there is a substantial identity between the estates to be

consolidated and whether consolidation is necessary to avoid some harm or realize some

benefit."  East Group Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 250 (11th Cir.

1991); see In re Gainsville P-H Properties, Inc., 106 B.R. 304, 306 (Bankr. M.D. Fla. 1989).

       While Bankruptcy Courts have moved away from the traditional "veil piercing" analysis

and have adopted the more liberal test that balances the benefits of consolidation against the

potential harms, see Augie/Restivo, 860 F.2d 515 and In re Auto-Train Corp., Inc., 810 F.2d 270

(D.C. Cir. 1987), the evidence, which also supports veil piercing under state law, strongly

supports that LIS and Arclogix should be substantively consolidated under such traditional

analysis. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619, 620 (1968) (the corporate veil may be pierced where the parent exercises "some form of pervasive control" of the activities of the subsidiary " *and* there is some fraudulent or injurious consequence of the intercorporate relationship") and Hanson v. Bradley, 298 Mass. 371, 381 (1937) ("The right and the duty of courts to look beyond the corporate forms are exercised only for the defeat of fraud or wrong, or the remedying of injustice"). See also 1 W.M. Fletcher, Cyclopedia of Corporations, *supra* at § 43, at 292 ("the injured party must show some connection between its injury and the parent's improper manner of doing business-without that connection, even when the parent exercises domination and control over the subsidiary, corporate separateness will be recognized").   Corporate formalities also may be disregarded "when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise *with substantial disregard of the separate nature of the corporate entities,* or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting" (emphasis added). Scott v. NG U.S. 1, Inc., 450 Mass. 760, 767-768 (2008), citing My Bread Baking Co., 353 Mass. at 619.

Numerous aspects justifying disregard of the corporate distinction between LIS and Arclogix, under either substantive consolidation or veil piercing, are present here.  Quite simply, the entire assets and operations were transferred from LIS to Arclogix on January 1, 2001.  As of that date, Arclogix served LIS's clients under the same contracts, using the same assets and employees, from the same business location.  While consideration for the purchase of LIS' assets did not pass until June 14, 2001, Arclogix employees used LIS computers and equipment that was ultimately sold from January 1 through the actual sale in June.

Financial activity undertaken by LIS appears on the financial statements of Arclogix.

Compare LIS' balance sheet as of December 31, 1999 (Exhibit 13) with Arclogix balance sheet

as of December 31, 1999, a full year before Arclogix even began operations (Exhibit 46).

Arclogix' balance sheet as of January 1, 2001 reflects accounts receivable of $200,751 as of that

date, despite not beginning business operations until January 1, 2001 (Exhibit 44).  Additionally,

Arclogix' balance sheet reflects LIS employee salaries that were expensed for development of

LIS' software (compare LIS balance sheet as of December 31, 2000, Exhibit 14, with Arclogix

balance sheet as of December 31, 2000, Exhibit 46, both reflecting expense of $559,938 for

"Computer Software"; see also Tr. 1:117-122).  While small equity interests in Arclogix were

distributed to employees Fyler, Donovan and Cahoon, Sperbeck remained the majority

shareholder of Arclogix, and was the sole shareholder of LIS, with sole control of both LIS and

Arclogix.

Substantive consolidation is similarly warranted under more liberal analysis, which

focuses upon economic factors rather than on the existence of fraud or misconduct.  See East

Group Properties, 935 F.2d at 249:

> There is a "modern" or "liberal" trend toward allowing substantive
> consolidation, which has its genesis in the increased judicial
> recognition of the widespread use of interrelated corporate
> structures by subsidiary corporations operating under a parent
> entity's corporate umbrella for tax and business purposes.

The so-called "Auto-Train test" examines three factors, all of which must be satisfied in

order to warrant substantive consolidation; (1) the movant must show a unity of interest and

identity between the entities to be consolidated; (2) the movant must show that consolidation is

necessary to avoid some harm or to realize some benefit; and (3) where a creditor will be

prejudiced, the benefits of consolidation must heavily outweigh the harm.  Auto-Train, 810 F.2d

at 276.  Once a movant has shown the first and second factor or made a *prima facie* case for

27

consolidation, "[t]he burden then shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." In re Bonham, 22 F.3d at 766.

In contrast to the Auto-Train test, the analysis developed by the Second Circuit in Augie/Restivo is a simple, two-factor disjunctive test.  Under the Second Circuit Augie/Restivo test, the court considers whether creditors dealt with the entitles to be consolidated as a single economic unit and did not rely on their separate identity in extending credit, or whether the affairs of the debtor are so entangled that consolidation will benefit all creditors.  Augie/Restivo, 860 F.2d at 518.  Both the Auto-Train and Augie/Restivo tests balance the benefits and harms of consolidation; however, the Augie/Restivo test is decidedly more liberal, as satisfaction of either factor is sufficient to find in favor of consolidation.  The First Circuit has found favor in the Augie/Restivo test, noting in dicta:

> Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs. The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs.  Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties.

In re Hemingway Transport, Inc., 954 F.2d at 11 n. 15, *citing* Augie/Restivo, among other cases.

Other courts within the First Circuit have referred to the Auto-Train test when considering whether to order substantive consolidation *nunc pro tunc* in order to take account of the alleged harm to creditors.  See In re Mars Stores, Inc., 150 B.R. 869, 879-880 (Bankr. D. Mass. 1993) (Goodman, J.) (noting that after a *prima facie* showing has been made that substantive consolidation will benefit creditors, the burden at trial rests with the objecting

creditor to prove it relied upon the separate credit of one of the entities to be consolidated and would accordingly be prejudiced by consolidation); In re Dehon, Inc., supra. And, more recently the Third Circuit adopted the Augie/Restivo test in In re Owens Corning, 419 F. 3d 195 (3d Cir. 2005).

In addition to the veil piercing analysis articulated above, the same evidence warrants substantive consolidation under the more liberal Auto-Train and Augie/Restivo tests. Without substantive consolidation, LIS' creditors, particularly APBLS, will be left without a remedy.

**III.   THE BANKRUPTCY COURT DID NOT COMMIT REVERSIBLE ERROR BY EXCLUDING TESTIMONY CONCERNING THE MEDIATION BETWEEN THE DEBTOR AND APBLS.**

   **A.   Communications Made During A Mediation May Not Be Disclosed, And Are Inadmissible.**

The Bankruptcy Judge did not err in excluding testimony pertaining to confidential settlement offers made during the course of a confidential mediation. Not only are the statements inadmissible due to the confidentiality of the mediation, they are also inadmissible under the Fed. R. Evid. 408 as a settlement offer. The Massachusetts Mediation Statute, G.L. c. 233, § 23(c), expressly provides that "[a]ny communication made in the course of and relating to the subject matter of any mediation and which is made in the presence of such mediator by any participant, mediator or other person shall be a confidential communication and not subject to disclosure in any judicial or administrative proceeding." The statute provides blanket confidentiality protection on the mediation process including an explicit prohibition on disclosure in judicial proceedings, without any listed exceptions. Leary v. Geoghan, 2002 WL 32140255 (Single Justice, Mass. App. Ct. 2002) (discussing that "the legislature enacted a statute that plainly reflects a policy judgment in favor of confidentiality"). Confidentiality under G.L. c.

233 § 23(c) applies regardless of whether a resolution was reached.  Town of Clinton v.
Geological Services Corp., 21 Mass. L. Rep. 609 (2006.

In addition to the Mediation Statute, when APBLS and LIS agreed to enter mediation,
both parties signed a contractual agreement providing for confidentiality of the mediation.
Neither of those parties is prepared to waive that confidence.  APBLS has not waived the
privilege, nor has the Trustee acting on behalf of LIS.  Sperbeck is in no position to waive the
confidence for either party and the discussion of an alleged settlement offer in his brief violates
the confidence of the mediation.

Moreover, the Supremacy Clause does not apply, as urged by the Appellants, as the
Massachusetts Mediation Statute is not in conflict with the Federal Rules of Evidence.  Federal
Rule 408 provides for the inadmissibility of settlements offers to prove liability for, invalidity of,
or amount of a claim.  Additionally, the evidence would have made no difference in the outcome
of the case, even if it were admitted.  The reason the appellant seeks to offer the evidence is to
provide circumstantial evidence of Sperbeck's intent regarding Logistics' assets.  Sperbeck
himself testified that he intended to leave LIS without assets against which APBLS could collect
if judgment were entered against it (Tr. 1:198-199):

> Q:  ...And for a period of time Foley/Hoag continued to prosecute the case
> on behalf of [LIS]. . .with the hope of recovering against [APBLS].
>
> A:  I suspect that would be the case.
>
> Q:  Yeah.  But you hedged your bets there, though, didn't you?  Because
> [LIS] didn't have any more assets, correct?
>
> A:  Correct.
>
> Q:  So if [APBLS] were to recover against [LIS] there'd be no assets to
> proceed against, correct?
>
> A:  Exactly.

One month before the mediation, APBLS had filed a counter-claim against LIS. Sperbeck was fully aware that a lawsuit was filed against him and that APBLS could recover a judgment against him.  Any settlement negotiations made during the mediation are irrelevant as the mediation was unsuccessful in reaching a settlement and the lawsuit between LIS and APBLS, including the counterclaim against LIS, continued.  All of the evidence clearly supports the bankruptcy judge's conclusion that Sperbeck created Arclogix to fraudulently transfer assets away from LIS.

**B.**     **Even If Evidence Of The Statements Made During The Mediation Were Erroneously Excluded By The Bankruptcy Court, Any Such Error Was Harmless and Not Reversible.**

Moreover, even if the Bankruptcy Judge erred in excluding testimony pertaining to potential settlement offers made during mediation, this Court must determine whether the ruling constituted a reversible or harmless error.  See Lynch v. City of Boston, 180 F.3d 1, 15 (1st Cir. 1999).  A trial judge's error in an evidentiary ruling does not require reversal unless it is harmful. Rubert-Torres ex rel. Cintron-Rupert v. Hospital San Pablo, Inc., 205 F.3d 472, 480 (1st Cir. 2000).  The improper exclusion of evidence constitutes harmless error unless a substantial right of a party is affected and the evidence excluded would have affected the outcome of the case. See Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights").  The First Circuit has held that an error is harmless when "we can say with fair assurance . . . that the judgment was not substantially swayed by the error." Tiller v. Baghdady, 244 F.3d 9, 15 (1st Cir. 2001), *citing* United States v. Gaines, 170 F.3d 72, 82 (1st

Cir. 1999); Lynch, 180 F.3d at 15, *citing* Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 46 (1st Cir. 1991).

Courts have found that exclusion of testimony by expert witnesses and lay witnesses constituted harmless error where substantial evidence was otherwise provided to support the finding. See Lynch, 180 F.3d at 17 (1st Cir. 1999). In Tiller, the Court found that although the trial judge erred in excluding documentary evidence supporting the Plaintiff's claim, the error was harmless. Tiller, 244 F.3d at 15 (where a sister sued her brother for unauthorized sale and use of her stock, the trial judge erred in excluding documentary evidence of defendant's disposition of the stock of his other sister). The First Circuit has found reversible error where a trial judge admitted evidence of a settlement and release of liability. McInnis v. A.M.F., Inc., 765 F.2d 240 (1985) (holding that the admission of settlement evidence between the plaintiff and a third party joint tortfeasor was a reversible error and constituted grounds for a new trial).

The Appellants have not articulated any argument as to how the evidence of what occurred in the mediation is probative of any issue that was before the Court. Thus, even if the evidence were incorrectly excluded – an argument that itself has no support – the Appellants have failed entirely to demonstrate that any such error was anything other than harmless.

# CONCLUSION

The judgment of the United States Bankruptcy Court for the District of Massachusetts in Adversary Proceeding No. 04-1188, and the March 18, 2009 final order substantively consolidating Arclogix, Inc. with the Debtor, should be affirmed for the reasons contained in this brief.

<div style="margin-left:50%">

JOSEPH BRAUNSTEIN, CHAPTER 7
TRUSTEE OF LOGISTICS
INFORMATION SYSTEMS, INC.
By his attorneys,

</div>

DATED:  October 9, 2009                 _/s/Mark W. Corner_____

Mark W. Corner, BBO No. 550156
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000
mcorner@riemerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Mark W. Corner hereby certify that on October 9, 2009 I caused to be served a copy of

the Brief of the Appellee to be served by electronic file notification upon the following counsel

of record:

> Ronald W. Dunbar, Jr., Esquire
> Dunbar Law, P.C.
> 10 High Street, Suite 700
> Boston, Massachusetts  02110

> _/s/Mark W. Corner_
> Mark W. Corner

1174939.1

# APPENDIX A

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

</div>

| | | |
|---|---|---|
| IN RE | ) | |
| LOGISTICS INFORMATION | ) | |
| SYSTEMS INC., | ) | |
| | ) | |
| DEBTOR | ) | CHAPTER 7 |
| _____ | ) | CASE NO. 03-10886-JBR |
| JOSEPH BRAUNSTEIN | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | AP. NO. 04-1188 |
| | ) | |
| WILLIAM E. SPERBECK, SUSAN | ) | |
| L. SPERBECK, & ARCLOGIX, INC., | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

<div align="center">

**MEMORANDUM OF DECISION**

</div>

This proceeding arises in a case referred to this Court by the Standing Order of Reference entered in this District and is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The Court is authorized to enter final judgment in this proceeding.

The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

In reaching its determination, the Court considered the demeanor and credibility of all witnesses who testified as well as the admitted exhibits and arguments and submissions of counsel.

It is appropriate to begin with a few words about credibility. The principal witness in this case was William E. Sperbeck. The Court found much of Mr. Sperbeck's testimony not convincing or credible. When convenient, Mr. Sperbeck claimed that he did not understand the

financial figures about which he was being questioned.  When troublesome or inconsistent

matters were raised during his testimony, his answer was often to blame an "error" on someone

else.  His explanations of certain activities, such as the formation of Arclogix and T Logic, were

superficial and lacking in substance.  When pressed for more detailed explanations of some of

his answers, he often demonstrated a demeanor that the Court found suggestive of less than

forthright answers.

The other witnesses appeared credible to the Court.

The Plaintiff filed a multi-count (10) complaint involving alleged fraudulent conveyances

under state law, actions for turnover under bankruptcy law, declaratory judgment, successor

liability, usurpation of corporate opportunity and assets, piercing the corporate veil, and reach

and apply.  The Plaintiff also filed a motion to substantively consolidate Arclogix with Logistics

Information Systems ("LIS") in the main case, (Docket #18), which mirrors the counts for

successor liability and piercing the corporate veil and is resolved by this decision.  The Court

accepts all facts agreed to in the Joint Pretrial Statement (Docket #79) and stipulated on the

record as proved.

The facts are not materially in dispute.  In fact, but for a few proposed findings and

rulings presented by the parties, I can and do adopt the findings and rulings suggested by the

parties, and enumerate those (with commentary) on Schedules A and B attached hereto.

There are some key facts and issues that require special and detailed comment by the

Court.

### Fraudulent Conveyance

Were there creditors in existence as of the time of the repayment of loans to Sperbeck by

LIS in late 2000 and early 2001?  The simple answer to this question is yes.  Although the

bookkeeper, Ms. Cahoon, and the principal, Mr. Sperbeck, insisted that all "bills" and all

2

"creditors" were paid, APBLS, a known counterclaimant in a lawsuit, is the holder of a "claim" albeit unliquidated and perhaps disputed, and cannot be ignored in the analysis of this case. *See* M.G.L. ch. 109A, § 2.

All funds and assets were transferred (although several categories such as good will, intellectual property, and contracts were not transferred by appropriate documentation, the manner of their usurpation and use support finding that they were transferred). It appears that the Debtor, its successors, Arclogix, all shareholders, employees, principals, contracting parties, etc. treated the assets as transferred so the Court will as well. No assets were left in the Debtor, LIS, to satisfy the claim of APBLS.

Assets were transferred to Arclogix for the depreciated tax value, if any, on the Debtor's balance sheet, with no fair market value analysis undertaken. The formation of Arclogix and the transfer took place _after_ the unsuccessful mediation of the APBLS lawsuit.

There was no evidence proferred of payment of "reasonably equivalent value," particularly of the assets _not_ listed on the bill of sale as transferred.

The question as to whether the remaining assets were "unreasonably small" for operation of the business need not be answered, as no further business was to be conducted.

Although not paid for, it appears that the net book value of the computer software of LIS, as well as possibly some accounts receivable, were carried over to Arclogix balance sheet without compensation to LIS.

### Actual "intent to hinder, delay, or defraud its creditors"

The Court did not find the explanation of why the new entity (Arclogix) was formed very credible. Sperbeck's testimony that it was some unnamed attorney's suggestion that it should be done to give stock to employees sounds contrived, particularly in light of Sperbeck's admission that the APBLS claim was in his mind when he implemented his plans. (Transcript pp. 198-

3

199). Moreover, there was no other evidence to corroborate his testimony of an unnamed attorney's advice.

The Court finds the notice of name change (Ex. 10) and the testimony with respect to the same (Transcript 1:61) and the notice to vendors (Ex. 21) and customers (various Exhibits such as C) compelling evidence of the intent to continue the LIS business under a new name and Arclogix so held itself out. Coupled with the non-payment for any contracts or intellectual property, while the financial statements of the new enterprise absorbed on its asset side the development costs for software, the Court is satisfied that there was actual intent that Arclogix be the successor to LIS, and it was so treated by all involved (vendors, employees, accountants, and contracting parties) with one very crucial exclusion, APBLS.

### Piercing Corporate Veil/ Substantive Consolidation

Following the conclusion of the trial, the Trustee obtained permission to conform the complaint to the evidence at trial. Pursuant to Count VII (against Arclogix for "successor liability"), and Count IX (against Sperbeck to "pierce the corporate veil of the Debtor"), the Trustee asserts that Arclogix is a mere continuation of the Debtor's business and that Sperbeck commingled "funds, assets and or management between [the Debtor] and Sperbeck" and used both the Debtor and Arclogix to hide his assets. Even though Count VII is styled as a successor liability count, the Trustee is really attempting either to pierce the corporate veil between Arclogix and the Debtor or substantively consolidate them with the Debtor; he is seeking a declaration that Arclogix's assets are the Debtor's assets. These counts tie in with the Trustee's Motion for Substantive Consolidation (Docket #18 in the Chapter 7 case; 03-10886), which was tried along with the adversary proceeding.

*Substantive consolidation versus piercing the corporate veil.*

Substantive consolidation is the emerging theory used by bankruptcy courts for

collapsing two or more entities and/or their estates into one. It is based on federal law. Piercing

the corporate veil is based on state law and bankruptcy courts are increasing moving away from

it as a theory to collapse entities into a single unit. While piercing the corporate veil examines

whether the entities are alter egos, substantive consolidation has additional considerations aimed

at examining the harm and benefit to all creditors.

As the Trustee notes in his post-trial brief, bankruptcy courts have the power, under

section 105 of the Bankruptcy Code, to substantively consolidate multiple entities, including

debtor and non-debtor entities, even though the power is not expressly stated in the Bankruptcy

Code.

> [T]he bankruptcy court had the power to enter the substantive
> consolidation order. [F]or many purposes, courts of bankruptcy are
> essentially courts of equity, and their proceedings inherently
> proceedings in equity. The bankruptcy court's power of substantive
> consolidation has been considered part of the bankruptcy court's
> general equitable powers since the passage of the Bankruptcy Act
> of 1898.

*In re Bonham,* 229 F.3d 750, 763 (9th Cir. 2000) (internal quotations and citations omitted); *see*

*also Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1, 12 (1st Cir. 1992);

*In re Dehon, Inc.,* 2004 WL 2181669 (Bankr. D. Mass. 2004). But the courts often use the term

loosely, with some courts analogizing substantive consolidation to corporate mergers, *In re*

*Parkway Calabasas, Ltd.,* 89 B.R. 832, 836 (Bankr. C.D. Cal. 1988), while others use the

verbiage of and the factors for piercing the corporate veil. *See In re Circle Land & Cattle Corp.,*

213 B.R. 870, 874 (Bankr. D. Kan. 1997) (explaining that courts are replacing veil piercing with

substantive consolidation). Substantive consolidation is often used to consolidate the *estates* of

two or more debtors. *In re Snider Bros., Inc.,* 18 B.R. 230, 234 (Bankr. D. Mass. 1982)

5

(referring to the equitable power to consolidate "the *estates*"). It can be used to consolidate

debtor and non-debtor entities, although often in the context of consolidating affiliated entities.

In *Dehon*, 2004 WL 2181669, *3-4, Judge Boroff explained

> Substantive consolidation, in effect, pools together the assets and liabilities of separate, yet related, entities, to form one estate in bankruptcy. Employing this tool, courts "pierce the corporate veil" in order to satisfy claims of the creditors of the consolidated entities from their common pool of assets. Large corporations, such as the Debtor, often use multi-tiered corporate structures, and substantive consolidation has been used to reach the assets and liabilities of a non-debtor subsidiary corporation.

> Different standards have been employed by courts to determine the appropriateness of substantive consolidation. In the First Circuit, bankruptcy courts remain unsettled as to what standard should be. One principle, however, remains constant: substantive consolidation should be approached with a concern for equitable treatment to all *creditors* involved. Notably, none of the tests weigh the interests of outside third parties. This is consistent with a core goal of the Bankruptcy Code to maximize the assets of debtors to satisfy their creditors' claims. (Internal citations omitted).

### *Standard for Substantive Consolidation*

The only pronouncement from the First Circuit regarding the standard to be used is found

in *Hemingway Transport*, 954 F.2d at 12, that this Court quoted in *In re Century Electronics*

*Mfg., Inc.*, 310 B.R. 485, 489 (Bankr. D. Mass.2004)[1]:

> Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs. The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs. Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties.

---

[1]The issue in *Century Electronics* was whether substantive consolidation should be given retroactive effect.

In *Century Electronics* this Court explained the test set out in *In re Auto-Train Corp., Inc.,* 810 F.2d 270, 276 (D.C.Cir.1987). That test has three parts, *all* of which must be met: (1) the proponent must show a substantial identity between the entities to be consolidated, *and* (2) the proponent must show that consolidation is necessary to avoid some harm or to realize some benefit, *and* (3) if a creditor objects and demonstrates that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation, then the court may order consolidation only if it determines that the demonstrated benefits of consolidation "heavily" outweigh the harm.

## *Standard for Piercing the Corporate Veil*

In *In re Aoki*, Adv. Pro. 03-4164, docket # 48, this Court adopted the language and test for piercing the corporate veil under Massachusetts law. The decision was affirmed on appeal by the BAP. As the panel stated

> The Massachusetts Supreme Judicial Court has described two situations when piercing the corporate veil is appropriate: "(1) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (2) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748, 752 (1968) (" *My Bread*").
>
> Adopting the *My Bread* standard, the Court of Appeals for the First Circuit set forth twelve factors to consider when deciding whether to pierce the corporate veil:
>
> (1) common ownership;
>
> (2) pervasive control;
>
> (3) confused intermingling of business activity, assets, or management;

(4) thin capitalization;

(5) nonobservance of corporate formalities;

(6) absence of corporate records;

(7) no payment of dividends;

(8) insolvency at the time of the litigated transaction;

(9) siphoning away of corporate assets by the dominant shareholders;

(10) nonfunctioning of officers and directors;

(11) use of the corporation for transactions of the dominant shareholders; and

(12) use of the corporation in promoting fraud.

*Pepsi-Cola,* 754 F.2d [10, 16 (1st Cir. 1985)]; *see also Evans v. Multicon Constr. Corp.,* 30 Mass. App. Ct. 728, 574 N.E.2d 395, 398 (1991) (applying the *Pepsi-Cola* factors); *The George Hyman Constr. Co. v. Gateman,* 16 F. Supp.2d 129, 151 (D. Mass. 1998) (same). Generally, in Massachusetts, *My Bread* sets the standard for deciding when to pierce the corporate veil, and *Pepsi-Cola* identifies a non-exclusive list of factors to be considered when engaging in a *My Bread* analysis. *See, e.g., Birbara v. Locke,* 99 F.3d 1233, 1238 (1st Cir. 1996). This analysis is also applicable in the bankruptcy context. *See MacDonald,* 114 B.R. [326, 331 (D. Mass. 1990)] (the equitable powers of the bankruptcy court enable them to apply the *My Bread* and *Pepsi-Cola* analysis to pierce the corporate veil in order to attribute a non-debtor corporation's assets or liabilities to the shareholders of the corporation) (citation omitted).

*In re Aoki,* 323 B.R. 803, 811 -12 (1st Cir. B.A.P. 2005).

Finally as the court in *In re Standard Brands Paint Co.,* 154 B.R. 563, 568-69 (Bankr. C.D. Cal. 1993), noted it is not uncommon or inappropriate to allow relief under both theories if the respective tests have been meet.

Sperbeck testified that there were no creditors of Arclogix. It would be extremely difficult and probably impossible to unravel the transfers made here, particularly since the contracts and software fraudulently usurped have "morphed" several times over in the years since the tainted transactions. As there are no creditors to be harmed, it seems to the Court that

8

the criteria for substantive consolidation of the Debtor and Arclogix effective as of March 18,
2009 is an appropriate remedy and it will be ordered.

### Susan Cahoon

With respect to the alleged liability of Susan Cahoon, the Court is not satisfied that Ms.
Cahoon had any knowledge that there was an unpaid claimant or creditor.  The Court cannot find
any evidence upon which a finding of intent to delay, defraud, etc. can be based either directly or
through inference.  It is not even clear to the Court what, if anything, Cahoon knew of the
Counterclaim that ultimately led to the judgment against LIS.

### Conclusion

Count I,  judgment for the Plaintiff against Arclogix. *

Count II,  judgment for the Plaintiff against Sperbeck in the amount of $254,163.50.

Count III,  judgment for the Plaintiff against Sperbeck, and Sperbeck is ordered to turnover the
sum of $254,163.50.

Count IV,  judgment for the Plaintiff against Arclogix. *

Count V,  judgment for the Plaintiff against Sperbeck in the amount of $424,499.

Count VI,  judgment for the Plaintiff as follows:  (1) Of the balance held in the Wellesley Bank
Account, $95,000 is declared to be property of the bankruptcy estate of Logisitics Information
Systems, Inc., and (2) the Plaintiff may reach and apply the balance of the Wellesley Bank
Account less $95,000, to satisfy Sperbeck's obligations under Counts II, III, and V.

Count VII,  judgment for the Plaintiff against Arclogix. *

Count VIII,  judgment for the Plaintiff against Sperbeck *, and judgment for the Defendant,
Cahoon.

Count IX,  judgment for the Defendant, Sperbeck.

Count X,  judgment for the Plaintiff against Sperbeck *, and judgment for the Defendant,

Cahoon.


* In lieu of a money judgment, the remedy for Counts I, IV, VII, VIII, and X is the substantive

consolidation of Logisitics Information Systems, Inc. and Arclogix, Inc.  A separate order will

issue in the main case granting the Trustee's Motion for Substantive Consolidation [Docket #18]

forthwith.

      A separate order will issue.


March 18, 2009                                    By the Court,

                                                  Joel B. Rosenthal
                                                  United States Bankruptcy Judge

## Schedule A

Court's determination of "Defendants' Proposed Findings of Fact" (Docket # 121)

**[* see commentary]**

| Irrelevant | Adopt | Do not adopt |
|---|---|---|
| 41 | 1-4* | 9 * |
| | 5-7 | 11 * |
| | 8 * | 18 * |
| | 10 | 24 * |
| | 12 | 28-29 |
| | 13 * | 40 |
| | 14 * | |
| | 15 | |
| | 16 * | |
| | 17 * | |
| | 19 | |
| | 20 * | |
| | 21-23 | |
| | 25 * | |
| | 26 * | |
| | 27 * | |
| | 30 | |
| | 31* | |
| | 32-35 | |
| | 36 * | |
| | 37-39 | |

Commentary on Defendants' Proposed Findings of Fact

**1-4-** Defendant's background is in sharp contrast to his superficial answers.

**8, 25-** It is unclear from the record what Ms. Cahoon knew with respect to the claim of APBLS.

11

**9, 11, 13, 14, 16-** The record reflects that Sperbeck made loans and received re-payments from Logisitics. The Court is not satisfied that the original loans and opening balance thereof was ever proved. Clearly, a paper trail evidencing these "loans" was never established.

**17, 18, 20-** See Text. The court does not adopt the statement that "Logisitics had no other creditors" and "APBLS was not yet a creditors of Logisitics." Further, the issue of "profit" is not relevant in this context.

**24 –** The Court does not adopt the second and third sentences of this proposed finding.

**26-** The letter referred to, Exhibit 10, advised all vendors of a "name change." There was no evidence that APBLS was sent this letter.

**27-** The Court does not adopt the second sentence of this proposed finding.

**31 –** The differences between the software do not seem relevant to the Court. Further, the Court is not convinced of the necessity or logic of Arclogix's formation to accomplish Sperbeck's objectives.

**36 –** This proposed finding is only partially correct. See text of memo concerning assets transferred.

Court's determination of "Defendants' Proposed Rulings of Law" (Docket # 121)

**[* see commentary]**

| Irrelevant | Adopt | Do no Adopt |
|---|---|---|
| 11 | 1-8 | |
| | 9 * | |
| | 10 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 * | |
| | 16-18 | |
| | 19 * | |
| | 20 | |
| | 21 * | |

Commentary on Defendants' Proposed Rulings of Law

**9-** This list of "factors" is not exclusive.  The word "not" should appear before the words "was"

and "reasonably" in #8.

**15, 19, 21** – These lists of "factors" are not exclusive.

13

## Schedule B

Court's determination of "Plaintiff's Proposed Findings of Fact" (Docket # 124)

**[\* see commentary]**

| Irrelevant | Adopt | Do not Accept |
|---|---|---|
|  | 1-25 | 29 |
|  | 26 \* | 30 |
|  | 27-28 | 40 |
|  | 31-39 | 48-49 |
|  | 41-47 | 51 \* |
|  | 50 |  |
|  | 52-102 |  |

## Commentary on Plaintiff's Proposed Findings of Fact

**26** – The record is not clear whether the payment was for anything other than assets listed on the check (Exs. 6 & 7).

**51** – It is unclear from the record whether any formal sale or transfer documents ever existed for some of the assets. See text of Memo.

Court's determination of "Plaintiff's Proposed Rulings of Law" (Docket # 124)

| Irrelevant | Adopt | Do not Accept |
|---|---|---|
| | 1 | 2 |
| | 3-10 | 11-13 |
| | 14-20 | |

# APPENDIX B

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

In Re:

LOGISTICS INFORMATION SYSTEMS,
INC.,

                    Debtor

Chapter 7
Case No. 03-10886-JBR

JOSEPH BRAUNSTEIN,
CHAPTER 7 TRUSTEE OF LOGISTICS
INFORMATION SYSTEMS, INC.,

                    Plaintiff

v.

WILLIAM E. SPERBECK, SUSAN L.
SPERBECK and ARCLOGIX, INC.,

                    Defendants

Adversary Proceeding
Case Number:  04-1188-JBR

## <u>ORDER</u>

In accordance with the Memorandum of Decision issued on March 18, 2009 (Docket No. 127), as amended by Order dated April 9, 2009 (Docket No. 166), it is ORDERED that judgment, as amended, shall enter as follows:

Count I, judgment for the Plaintiff against Arclogix.*

Count II, judgment for the Plaintiff against Sperbeck in the amount of $254,163.50, with prejudgment interest of $23,179.67.

Count III, judgment for the Plaintiff against Sperbeck, and Sperbeck is ordered to turnover the sum of $254,163.50, with prejudgment interest of $23,179.67.

Count IV, judgment for the Plaintiff against Arclogix.*

Count V, judgment for the Plaintiff against Sperbeck in the amount of $424,499.

Count VI, judgment for the Plaintiff as follows: (1) of the balance held in the Wellesley

Bank Account, $95,000 is declared to be property of the bankruptcy estate of Logistics

Information Systems, Inc., and (2) the Plaintiff may reach and apply the balance of the Wellesley

Bank Account less $95,000, to satisfy Sperbeck's obligations under Counts II, III and V.

Count VII, judgment for the Plaintiff against Arclogix.*

Count VIII, judgment for the Plaintiff against Sperbeck*, and judgment for the

Defendant, Cahoon.

Count IX, judgment for the Defendant, Sperbeck.

Count X, judgment for the Plaintiff against Sperbeck*, and judgment for the Defendant,

Cahoon.

All references herein are to the Plaintiff's Amended Complaint [Docket #112].

*In lieu of money judgment, the remedy for Counts I, IV, VII, VIII, and X is the

substantive consolidation of Logistics Information Systems, Inc. and Arclogix, Inc. A separate

order will issue in the main case granting the Trustee's Motion for Substantive Consolidation

[Docket #18] forthwith.

DATED: April 13, 2009

By the Court,

Joel B. Rosenthal
United States Bankruptcy Judge

2